Nos. 24-2184, 24-2185, 24-2189, 24-2194

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————————

IN RE LIPITOR ANTITRUST LITIGATION

———————————

On Appeal from the June 6, 2024 Judgment of the
United States District Court for the District of New Jersey,
Judge Peter G. Sheridan, Ret., Presiding

———————————

BRIEF OF INDIVIDUAL RETAILER APPELLANTS
(Provisionally Filed Under Seal)

———————————

Barry L. Refsin
Eric L. Bloom
Caitlin V. McHugh
HANGLEY ARONCHICK SEGAL
  PUDLIN & SCHILLER
One Logan Square, 27th Floor
Philadelphia, PA 19103
Tel: (215) 568-6200
Fax: (215) 568-0300
  *Counsel for CVS Pharmacy, Inc. et
  al.*

Joseph M. Vanek
David P. Germaine
John P. Bjork
SPERLING & SLATER, P.C.
55 W. Monroe Street, Suite 3200
Chicago, Illinois 60603
Tel: (312) 641-3200
Fax: (312) 641-6492
  *Counsel for Meijer, Inc. & Meijer
  Distribution, Inc.*

Scott E. Perwin
Lauren C. Ravkind
Anna T. Neill
KENNY NACHWALTER, P.A.
1441 Brickell Ave
Miami, FL 33131
Tel. (305) 373-1000
Fax: (305) 372-1861
  *Counsel for Walgreen Co. et al.*

Bernard D. Marcus
Moira Cain-Mannix
Brian C. Hill
MARCUS & SHAPIRA LLP
One Oxford Centre, 35th Floor
Pittsburgh, PA 15219
Tel.: (412) 338-3344
Fax: (412) 391-8758
  *Counsel for Giant Eagle, Inc.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, the undersigned counsel certify that:

1.     Plaintiff-Appellant CVS Pharmacy, Inc. is a publicly traded corporation with no parent corporations, and no publicly held company owns 10% or more of CVS Pharmacy, Inc.'s stock.

2.     Plaintiff-Appellant Rite Aid Corporation ("Rite Aid") is now a privately owned company and no publicly held company owns 10% or more of Rite Aid's stock.  As a result of Rite Aid's bankruptcy, Rite Aid's claims in this case have been transferred to RAD Sub-Trust A, a litigation trust authorized by Rite Aid's confirmed bankruptcy plan to continue to prosecute this case in Rite Aid's name.  The beneficiaries of RAD Sub-Trust A are over 5,000 unsecured creditors of Rite Aid and its affiliates, none of which has more than a 10% beneficial interest.

3.     Plaintiff-Appellant Rite Aid Hdqtrs. Corp. is a wholly owned subsidiary of Rite Aid, which is now a privately owned company, and no publicly held company owns 10% or more of Rite Aid's stock.  As a result of Rite Aid's bankruptcy, Rite Aid's claims in this case have been transferred to RAD Sub-Trust A, a litigation trust authorized by Rite Aid's confirmed bankruptcy plan to continue to prosecute this case in Rite Aid's name.  The beneficiaries of RAD Sub-

Trust A are over 5,000 unsecured creditors of Rite Aid and its affiliates, none of which has more than a 10% beneficial interest.

4.      Plaintiff-Appellant JCG (PJC) USA, LLC is a wholly owned subsidiary of Rite Aid, which is now a privately owned company, and no publicly held company owns 10% or more of Rite Aid's stock.  As a result of Rite Aid's bankruptcy, Rite Aid's claims in this case have been transferred to RAD Sub-Trust A, a litigation trust authorized by Rite Aid's confirmed bankruptcy plan to continue to prosecute this case in Rite Aid's name.  The beneficiaries of RAD Sub-Trust A are over 5,000 unsecured creditors of Rite Aid and its affiliates, none of which has more than a 10% beneficial interest.

5.      Plaintiff-Appellant Eckerd Corporation is a wholly owned indirect subsidiary of Rite Aid, which is now a privately owned company, and no publicly held company owns 10% or more of Rite Aid's stock.  As a result of Rite Aid's bankruptcy, Rite Aid's claims in this case have been transferred to RAD Sub-Trust A, a litigation trust authorized by Rite Aid's confirmed bankruptcy plan to continue to prosecute this case in Rite Aid's name.  The beneficiaries of RAD Sub-Trust A are over 5,000 unsecured creditors of Rite Aid and its affiliates, none of which has more than a 10% beneficial interest.

6.      Plaintiff-Appellant Maxi Drug, Inc. d/b/a Brooks Pharmacy is a wholly owned indirect subsidiary of Rite Aid, which is now a privately owned

company, and no publicly held company owns 10% or more of Rite Aid's stock.

As a result of Rite Aid's bankruptcy, Rite Aid's claims in this case have been

transferred to RAD Sub-Trust A, a litigation trust authorized by Rite Aid's

confirmed bankruptcy plan to continue to prosecute this case in Rite Aid's name.

The beneficiaries of RAD Sub-Trust A are over 5,000 unsecured creditors of Rite

Aid and its affiliates, none of which has more than a 10% beneficial interest.

7.     Plaintiff-Appellant Walgreen Co. is a wholly owned subsidiary of

Walgreens Boots Alliance, Inc.  Walgreens Boots Alliance, Inc. has no parent

corporations, and no publicly traded company owns 10% or more of its stock.

8.     Plaintiff-Appellant The Kroger Co. has no parent corporations, and no

publicly traded company owns 10% or more of its stock.

9.     Plaintiff-Appellant Safeway Inc. is a subsidiary of Albertson's

Companies, Inc.  Albertson's Companies, Inc. has no parent corporations, and no

publicly traded company owns 10% or more of its stock.

10.     Plaintiff-Appellant Supervalu Inc. n/k/a United Natural Foods, Inc.

has no parent corporations, and no publicly traded company owns 10% or more of

its stock.

11.     Plaintiff-Appellant HEB Grocery Company L.P. n/k/a/ H-E-B L.P.

has no parent corporations, and no publicly traded company owns 10% or more of

its stock.

12.    Plaintiff-Appellant Giant Eagle, Inc. has no parent corporations, and no publicly traded company owns 10% or more of its stock.

13.    Plaintiffs-Appellants Meijer, Inc., and Meijer Distribution, Inc. ("Meijer") are Michigan corporations with their principal places of business in Grand Rapids, Michigan.  Meijer Companies Ltd. is the parent corporation of Meijer, Inc.  Meijer Distribution, Inc. is a wholly owned subsidiary of Meijer, Inc. No publicly held corporation owns 10% or more of either parties' stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF CONTENTS...................................................................................v

TABLE OF AUTHORITIES ......................................................................... vii

JURISDICTIONAL STATEMENT .................................................................1

STATEMENT OF ISSUES FOR REVIEW ....................................................1

STATEMENT OF RELATED PROCEEDINGS AND CASES ............................2

STATEMENT OF THE CASE.........................................................................3

    I.    Relevant Facts.........................................................................3

        A.   Lipitor ...........................................................................3

        B.   Challenged Conduct ....................................................4

        C.   FDA Approval ..............................................................6

        D.   Plaintiffs' Causation Theory.......................................15

    II.   Procedural History ..............................................................17

    III.  District Court's Opinion ......................................................20

SUMMARY OF ARGUMENT .......................................................................24

STANDARD OF REVIEW ............................................................................27

ARGUMENT ................................................................................................28

    I.    CAUSATION IS PARTICULARLY ILL-SUITED FOR
        SUMMARY JUDGMENT. .................................................28

    II.   PLAINTIFFS IDENTIFIED SUBSTANTIAL EVIDENCE
        THAT DEFENDANTS' VIOLATION CAUSED SOME
        DELAY OF FDA'S APPROVAL OF GENERIC LIPITOR. ..............31

A.    Plaintiffs Did Not Need to Prove that the AIP Exception Would Have Been Granted Earlier to Establish That Ranbaxy's Violation Caused Some Delay. ...................................32

B.    Most of the Facts That the District Court Recited in Its Opinion Were Immaterial or Disputed. ........................................34

C.    The Facts Show that FDA Likely Would Have Granted Final Approval Earlier Had Ranbaxy Agreed on an Earlier No-Payment Entry Date. ...........................................................36

D.    The District Court Improperly Resolved Disputed Facts Against Plaintiffs. ...........................................................................42

III.    PLAINTIFFS ALSO IDENTIFIED SUBSTANTIAL EVIDENCE THAT RANBAXY'S VIOLATION CAUSED DELAY OF THE AIP EXCEPTION. ...................................................46

IV.    THE DISTRICT COURT'S GRANT OF BIFURCATED DISCOVERY WAS REVERSIBLE ERROR. ......................................53

CONCLUSION ....................................................................................................56

# TABLE OF AUTHORITIES

## Cases

*2660 Woodley Rd. Joint Venture v. ITT Sheraton Corp.*, 369 F.3d 732 (3d Cir. 2004) ................................................................................. 29

*Affiliated Capital Corp. v. City of Houston*, 735 F.2d 1555 (5th Cir. 1984), *overruled by City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365 (1991) ........................................................... 29

*Allegheny Gen. Hosp. v. Philip Morris, Inc.*, 228 F.3d 429 (3d Cir. 2000) ....................................................................................... 29

*Am. Bearing Co. v. Litton Indus., Inc.*, 729 F.2d 943 (3d Cir. 1984) ..................... 29

*Arnold Pontiac-GMC, Inc. v. Gen. Motors Corp.*, 786 F.2d 564 (3d Cir. 1986) ......................................................................... 28, 55

*Barr Labs., Inc. v. Abbott Labs.*, 978 F.2d 98 (3d Cir. 1992) ................................ 53

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ................................................ 3

*Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358 (3d Cir. 1992) ..................................................................................... 28

*Bigelow v. RKO Radio Pictures*, 327 U.S. 251 (1946) .................................... 30, 44

*Boswell v. Eoon*, 452 F. App'x 107 (3d Cir. 2011) .................................................. 36

*Callahan v. A.E.V., Inc.*, 182 F.3d 237 (3d Cir. 1999) ............................................ 28

*Clarity Sports Int'l LLC v. Redland Sports*, 400 F. Supp. 3d 161 (M.D. Pa. 2019) .................................................................................... 53

*FTC v. Actavis, Inc.*, 570 U.S. 136 (2013) .............................................................. 16

*Hanover 3201 Realty LLC v. Village Supermarkets, Inc.*, No. 2:14-cv-1327 (SRC)(CLW), 2016 WL 4541870 (D.N.J. Aug. 31, 2016) ................... 53

*Hawkins v. Globe Life Ins. Co.*, 105 F. Supp. 3d 430 (D.N.J. 2015) ..................... 35

*In re AndroGel Antitrust Litig. (No. II)*, No. 1:09-MD-2084-TWT, 2018 WL 2984873 (N.D. Ga. June 14, 2018) ...................................................16

*In re Domestic Drywall Antitrust Litig.*, 322 F.R.D. 188 (E.D. Pa. 2017) .............................................................................................30

*In re Flonase Antitrust Litig.*, 798 F. Supp. 2d 619 (E.D. Pa. 2011) ............... 29, 40

*In re Linerboard Antirust Litig.*, 497 F. Supp. 2d 666 (E.D. Pa. 2007) ........... 30, 31

*In re Lipitor Antitrust Litig.*, 46 F. Supp. 3d 523 (D.N.J. 2014) .............................3

*In re Lipitor Antitrust Litig.*, 855 F.3d 126 (3d Cir. 2017) .......................................2

*In re Lipitor Antitrust Litig.*, 868 F.3d 231 (3d Cir. 2017) ............................. passim

*In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152 (S.D.N.Y. 2018) ..............................................................................41

*In re Opana ER Antitrust Litig.*, No 14 C 10150, 2021 WL 2291067 (N.D. Ill. June 4, 2021) .......................................................................16

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. 14-md-02503, 2018 WL 563144 (D. Mass. Jan. 25, 2018) ...................................16

*In re Wellbutrin XL Antitrust Litigation*, 868 F.3d 132 (3d Cir. 2017) ........................................................... 26, 29, 38, 39

*In re Zetia (Ezetimibe) Antitrust Litig.*, 655 F. Supp. 3d 406 (E.D. Va. 2023) ................................................................................................39

*In re Zetia (Ezetimibe) Antitrust Litig.*, MDL No. 2:18-md-2836, 2022 WL 4355149 (E.D. Va. Sept. 2, 2022), *report and recommendation adopted by* 655 F. Supp. 3d 406 (E.D. Va. 2023) ................................................................................................40

*Integon Nat'l Ins. Co. v. Rodriguez*, No. 22-3280 (RK) (JBD), 2024 WL 3634193 (D.N.J. Aug. 2, 2014) .............................................................36

*J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557 (1981) .............. 30, 44

*Kalmus v. Flagship Resort Dev. Corp.*, No. 3:16-cv-1771-BRM-TJB, 2018 WL 4144691 (D.N.J. Aug. 30, 2018) .......................................................35

viii

*King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, 88 F. Supp. 3d 402 (E.D. Pa. 2015) ...................................................................................27

*King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, No. 2:06-cv-1797, 2015 WL 12645764 (E.D. Pa. Dec. 22, 2015) ..................................41

*La. Wholesale Drug Co. v. Sanofi-Aventis*, No. 07 CV 7343(HB), 2008 WL 4580016 (S.D.N.Y. Oct. 14, 2008) ......................................41

*Lansford-Coaldale Joint Water Auth. v. Tonolli Corp.*, 4 F.3d 1209 (3d Cir. 1993) ...........................................................................42

*MacLean v. Wipro Ltd.*, No. 20-03414 (GC)(JBD), 2023 WL 3742832 (D.N.J. May 31, 2023) ....................................................................53

*Malcolm v. Marathon Oil Co.*, 642 F.2d 845 (5th Cir. 1981) ...............................30

*Mannington Mills, Inc. v. Congoleum Indus., Inc.*, 610 F.2d 1059 (3d Cir. 1979) .......................................................................................55

*Noble v. City of Camden*, 112 F. Supp. 3d 208 (D.N.J. 2015) ...............................35

*Pastavalava v. Wolf*, No. 1:19-cv-09211-NLH, 2020 WL 6883433 (D.N.J. Nov. 24, 2020) ...................................................................35

*Rivas v. City of Passaic*, 365 F.3d 181 (3d Cir. 2004) ...........................................28

*Shelton v. Bledsoe*, 775 F.3d 554 (3d Cir. 2015) ....................................................28

*Takeda Pharm. Co. Ltd. v. Zydus Pharms. (USA) Inc.*, 358 F. Supp. 3d 389 (D.N.J. 2018) ...............................................................40

*United Food & Com. Workers Local 1776 & Participating Emps. Health & Welfare Fund v. Teikoku Pharma USA*, 296 F. Supp. 3d 1142 (N.D. Cal. 2017) ("*Lidoderm*") .........................................16

*Univac Dental Co. v. Dentsply Int'l, Inc.*, No. 1:07-CV-0493, 2010 WL 1816745 (M.D. Pa. Apr. 27, 2010) ...........................................30

*Value Drug Co. v. Takeda Pharms., U.S.A., Inc.*, No. 21-3500, 2022 WL 952896 (E.D. Pa. Mar. 30, 2022) ...........................................40

*Wilson v. Quest Diagnostics, Inc.*, No. 18-11960 (WJM), 2019 WL 7560932 (D.N.J. Aug. 22, 2019) .......................................................53

*Wortley v. Camplin*, 333 F.3d 284 (1st Cir. 2003) .................................29

*Young v. Martin*, 801 F.3d 172 (3d Cir. 2015) ........................................27

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100 (1969) ........................29

**Statutes**

15 U.S.C. § 1 ...............................................................................................1

15 U.S.C. § 15 ...........................................................................................28

15 U.S.C. § 2 ...............................................................................................1

28 U.S.C. § 1291 .........................................................................................1

28 U.S.C. § 1331 .........................................................................................1

28 U.S.C. § 1337 .........................................................................................1

## JURISDICTIONAL STATEMENT

Plaintiffs[1] filed this antitrust case pursuant to sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2, against Defendants Pfizer, Inc. and certain of its affiliates and subsidiaries ("Pfizer"), manufacturer of the blockbuster branded cholesterol drug Lipitor, and Ranbaxy Pharmaceuticals, Inc. and its affiliates ("Ranbaxy"), a generic manufacturer seeking to introduce generic Lipitor. The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337.

On June 6, 2024, the district court granted Ranbaxy's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56.[2] Plaintiffs filed timely notices of appeal. JA0001-20. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF ISSUES FOR REVIEW

1. Did the district court err in granting summary judgment based on its conclusion that there was no disputed issue of fact concerning whether Ranbaxy's anticompetitive conduct caused a delay of even one day of the approval of Ranbaxy's Abbreviated New Drug Application ("ANDA") for Lipitor where even the limited discovery permitted showed that the entry date that Pfizer paid

---

[1] Plaintiffs filing this brief are the individual retail pharmacies identified in the Corporate Disclosure Statement.

[2] The motion was originally filed by Pfizer and Ranbaxy. JA0379. However, Pfizer settled and is not a party to this appeal.

Ranbaxy to accept was a material factor in the timing of the review and approval of Ranbaxy's ANDA by the Food and Drug Administration ("FDA")?

2.  Did the district court abuse its discretion in restricting discovery to the narrow question of whether there was evidence that FDA would have granted earlier approval of Ranbaxy's ANDA had Pfizer not paid Ranbaxy to delay its entry until November 30, 2011, an issue that should be considered in the context of Ranbaxy's antitrust violation and Plaintiffs' complete causation theory?

The district court (Sheridan, J.) addressed Plaintiffs' evidence of causation in its summary judgment opinion of June 6, 2024 (JA0033-115).  It overruled Plaintiffs' objections to the phasing of discovery and summary judgment practice in its order of September 29, 2022 (JA0024-32), and Plaintiffs further identified the improper limits on the summary judgment record in the Rule 56(d) affidavit filed with their opposition to summary judgment (JA2439-49).

## STATEMENT OF RELATED PROCEEDINGS AND CASES

This case was previously before this Court on appeal from the district court's orders of September 5, 2013, and September 12, 2014, dismissing Plaintiffs' claims.  JA0312, JA0323 (ECF 455, 566).  That appeal was consolidated with another appeal from the same district court raising similar issues concerning the drug Effexor XR.  *See In re Lipitor Antitrust Litig.*, 855 F.3d 126, 133 (3d Cir. 2017).  On April 13, 2017, this Court held that it had jurisdiction to hear Plaintiffs'

appeal of both cases rather than the Federal Circuit. *Id.* at 152. On August 21, 2017, this Court reversed the dismissals of both cases, holding that the district court had improperly demanded a level of heightened pleading contrary to *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). *See In re Lipitor Antitrust Litig.*, 868 F.3d 231, 254 (3d Cir. 2017).

Four groups of Retailer Plaintiffs, a Direct Purchaser Class, and an End-Payor Class separately appealed the district court's grant of summary judgment, and the Direct and End-Payor Classes appealed the district court's denial of class certification. JA0001-20. All of these appeals have been consolidated by this Court for briefing, argument, and disposition.

## STATEMENT OF THE CASE

### I. Relevant Facts

#### A. Lipitor

Lipitor is Pfizer's branded atorvastatin calcium product, a cholesterol-lowering drug. JA0036-37. Its sales reached $1 billion within 12 months of its January 1997 launch, and it ultimately became the largest selling drug of all time with sales of $1 billion per month (more than $33 million, a *day*). *See In re Lipitor Antitrust Litig.,* 46 F. Supp. 3d 523, 528 (D.N.J. 2014).

In 1987, the U.S. Patent and Trademark Office ("PTO") granted Pfizer U.S. Patent No. 4,681,893 (the "'893 Patent"), which claimed atorvastatin. *Lipitor*, 868

F.3d at 242. The patent was scheduled to expire on May 30, 2006, but later

extensions lengthened the period of patent exclusivity to March 24, 2010. *Id.* In

December 1993, Pfizer obtained additional protection for Lipitor when the PTO

issued U.S. Patent No. 5,273,995 (the "'995 Patent"), which claimed the specific

salt form of atorvastatin used in Lipitor. *Id.* The '995 Patent expired on June 28,

2011. *Id.* Pfizer listed these patents (and others) in the "Orange Book," an FDA

publication that identifies patents submitted by brand manufacturers as covering

the branded drug. *Id.* at 240, 243.

On August 19, 2002, Ranbaxy filed the first substantially complete ANDA

with the FDA seeking to market generic Lipitor. JA0039 (6/6/24 Op.). Pursuant to

the Hatch-Waxman Act, Ranbaxy made what is commonly known as a "paragraph

IV certification" that each of Pfizer's Orange Book-listed patents for Lipitor was

invalid, unenforceable, or not infringed by Ranbaxy's generic. As a result,

pursuant to the Hatch-Waxman Act, Ranbaxy was eligible for 180 days as the

exclusive seller of generic Lipitor once it launched. *Id.*

### B.  Challenged Conduct

This Court previously described the full range of anticompetitive conduct

alleged by Plaintiffs. *See Lipitor*, 868 F.3d at 242-45. It held that Plaintiffs had

adequately pled that Pfizer fraudulently procured the '995 Patent, wrongfully listed

that patent in the Orange Book, engaged in sham litigation with respect to it, filed a

4

sham citizen petition with the FDA to delay generic Lipitor, and ultimately made a large reverse payment to Ranbaxy to delay generic Lipitor. *Id.* Following Plaintiffs' settlement with Pfizer, the remaining claim against Ranbaxy is premised on Pfizer's reverse payment to Ranbaxy.

That claim arises out of Pfizer's June 17, 2008 settlement of patent litigation against Ranbaxy. 868 F.3d at 244. Pfizer and Ranbaxy settled after the Federal Circuit reversed a ruling by the district court that the '995 Patent was valid and infringed, and Pfizer filed a new lawsuit against Ranbaxy for alleged infringement of two patents claiming certain processes for manufacturing Lipitor. *Id.* at 243-44.[3] In the settlement, Ranbaxy agreed to delay launching generic Lipitor until November 30, 2011, twenty months beyond expiration of the '893 Patent and five months beyond expiration of the '995 Patent, which Ranbaxy alleged had been fraudulently procured. *Id.*

Plaintiffs alleged that Ranbaxy accepted this entry date because of Pfizer's reverse payment. The payment mainly took the form of a sweetheart settlement of a separate lawsuit between Pfizer and Ranbaxy involving the drug Accupril. Pfizer forgave hundreds of millions of dollars in damages caused by Ranbaxy's at-risk

---

[3] The Federal Circuit upheld the district court's ruling that the '893 Patent was valid and infringed. 868 F.3d at 243.

5

launch of Accupril in return for Ranbaxy's *de minimis* payment of $1 million.[4]  *Id.*

at 253.  This Court held that Plaintiffs had sufficiently alleged that "Pfizer agreed

to release the *Accupril* claims against Ranbaxy, which were likely to succeed and

worth hundreds of millions of dollars, in exchange for Ranbaxy's delay in the

release of its generic version of Lipitor."  *Id.*

## C.  FDA Approval

The district court granted summary judgment because it concluded that it

was undisputed that FDA would not have approved Ranbaxy's ANDA even one

day earlier than November 30, 2011, had Pfizer and Ranbaxy agreed in June 2008

to an earlier generic entry date absent the reverse payment.  A brief summary of

the relevant facts showing the impact of the November 30, 2011 entry date on FDA

approval follows.

On October 11, 2002, FDA's Office of Generic Drugs ("OGD"), the division

responsible for reviewing and approving ANDAs, informed Ranbaxy that its

ANDA was received and considered acceptable for filing as of its August 19, 2002,

submission date.  JA1098-100 (10/11/02 Ltr.).  Subsequently, FDA and Ranbaxy

exchanged typical questions and responses regarding Ranbaxy's ANDA.  JA2750

---

[4] Plaintiffs also alleged that Pfizer compensated Ranbaxy by giving it the right
to market generic Lipitor in certain foreign markets.  *Id.* at 244.

(Karst Rpt. ¶ 58).

On February 25, 2009, about eight months after the Pfizer settlement, FDA invoked its Application Integrity Policy ("AIP") with respect to Ranbaxy's manufacturing facility in Paonta Sahib, India, the site designated to manufacture Ranbaxy's generic Lipitor. JA1359-60 (2/25/09 Email). FDA invoked the AIP after inspections of the Paonta Sahib facility revealed significant compliance issues. JA1508-14 (2/25/09 Mem.). FDA told Ranbaxy that its policy once the AIP was invoked was not to conduct or continue any normal scientific review of any pending application or supplement containing data from the affected site until the compliance issues had been resolved and the data or information found reliable. JA1512. In the same letter, FDA informed Ranbaxy that, "[i]n the case of certain applications, however, [FDA] may review and act on an application prior to completion of the validity assessment in special circumstances where such an action is clearly in the interest of public health." *Id.*

FDA was aware of the entry date that Pfizer and Ranbaxy negotiated for the launch of generic Lipitor. At a meeting on August 18, 2009, Ranbaxy informed FDA that it planned to launch generic Lipitor on November 30, 2011. JA3839-43 (8/18/09 Minutes). At the meeting, Ranbaxy "stressed [to FDA] the importance of assuring the earliest availability of [generic Lipitor] to the public, and that Ranbaxy was seeking FDA's support by continuing [its] substantive scientific review."

7

JA3842.

On December 4, 2009, and November 12, 2010, Ranbaxy amended its

ANDA. JA4154-55 & JA1555. The amendments added: (1) Ranbaxy's Ohm

Laboratories facility in New Jersey as an additional manufacturing site for generic

Lipitor, and (2) Ranbaxy's Toansa facility ("Toansa") in Punjab, India, as an

additional supplier of atorvastatin, the active pharmaceutical ingredient ("API") of

generic Lipitor. *Id.* Neither facility was subject to the AIP. JA1508-14 (2/25/09

Mem.). Ranbaxy also changed the form and manufacturer of the API used for

generic Lipitor from amorphous atorvastatin manufactured by Ranbaxy to the

crystalline atorvastatin manufactured by Pfizer. JA4154 (12/4/09 Amend.). As

part of the settlement agreement, Pfizer agreed to license and sell crystalline

atorvastatin to Ranbaxy. JA3312 & JA3364.

In late 2010 and early 2011, as the November 30, 2011, entry date

approached, other generic manufacturers with Lipitor ANDAs recognized that

FDA still had not approved Ranbaxy's Lipitor ANDA and that Ranbaxy's first-to-

file exclusivity could delay the approval of their own ANDAs. JA1074 (Teva)

(7/29/11 Mem.); JA4233-45 (Apotex Ltr.); JA4272-78 (Matrix/Mylan Ltr.).

Consequently, they asked FDA to declare Ranbaxy ineligible for the 180-day first-

to-file exclusivity because of the AIP. JA1074 (7/29/11 Mem.). These requests

noted Ranbaxy's agreed entry date of November 30, 2011. JA4236; JA4274.

In light of its knowledge of the November 30, 2011, negotiated entry date, FDA acted to ensure that its approval processes not delay the launch of generic Lipitor. In a February 17, 2011, internal email, Robert West, FDA's then-Deputy Director, wrote to the various "Atorvastatin Teams" responsible for reviewing Lipitor ANDAs to identify the various potential paths for FDA approval. JA2116-7. He noted that Teva and Matrix had settlements with Pfizer purporting to permit them to launch on or about June 28, 2011. JA2116. However, he further noted the Pfizer settlement allowing Ranbaxy to enter on November 30, 2011, if its ANDA were approved, and Ranbaxy's apparent eligibility for first-to-file exclusivity that would block Teva and Matrix from launching unless Ranbaxy was found ineligible for that exclusivity. *Id.*

Mr. West noted that he had discussed the various Lipitor ANDAs with senior personnel at FDA "due to the unique nature and medical necessity of Atorvastatin Calcium Tablets." *Id.* In particular, he talked to Keith Webber, Acting Director of OGD, and OGD counsel, and FDA's Office of Pharmaceutical Science ("OPS") and the Center for Drug Evaluation and Research ("CDER"). All agreed that OGD needed "to be prepared to take an action no matter what the outcome of the Ranbaxy 180-day eligibility decision." *Id.* Accordingly, Mr. West noted that OGD would grant "'expedited review' status" to the Teva and Matrix ANDAs and that it expected "[i]n the near future" to grant "'expedited review'

9

status" to Ranbaxy's ANDA.  *Id.*

On April 8, 2011, Mr. West issued a formal memorandum memorializing FDA's earlier decision to grant expedited review of the ANDAs of the subsequent generic ANDA filers.  JA2096-98; *see also* JA1180 (11/7/11 OGD approval) (noting that Ranbaxy's ANDA also received expedited review).  The memorandum explained that the circumstances did not "fit squarely" within those previously recognized by OGD in its policy and procedures as warranting expedited review, but that circumstances warranted such review.  JA2096 n.1.  Those circumstances were "the existence and complexity of the questions related to the Ranbaxy AIP and ANDA reliability, the highly uncertain date upon which ANDAs may be eligible for final approval, the review issues posed by the applications, and *the size of the market demand for this drug product*."  *Id.* (emphasis added).

Mr. West further emphasized FDA's "long-term goal of reviewing pending ANDAs in such a manner that, by the time . . . barriers to approval have expired, appropriate reviews will have been completed."  *Id.*  He specifically identified November 30, 2011, as "the earliest date Ranbaxy could market under its 2008 settlement agreement with Pfizer."  JA2097.  He concluded that management of OGD's workload required consideration of "these unusual circumstances and the possibility that Ranbaxy may lose its claim for exclusivity either by relinquishing it or by an agency determination that Ranbaxy is not eligible for exclusivity, e.g.,

10

because Ranbaxy's ANDA was not 'substantially complete' at the time of its submission." *Id.* He specifically noted that the subsequent generic ANDA filers had asked FDA to declare Ranbaxy ineligible for 180-day exclusivity because of the AIP. *Id.*

On May 11, 2011, FDA issued an internal memorandum documenting its grant of the AIP exception for Ranbaxy's Lipitor ANDA. JA1043-48. The memorandum reiterated that November 30, 2011, was "the earliest date Ranbaxy could market its atorvastatin product under its 2008 settlement agreement with Pfizer" and that "[i]f Ranbaxy were to retain eligibility for [180-day] exclusivity, obtain approval of its ANDA, and market immediately, its exclusivity would expire at the end of May 2012." JA1045. Among the six reasons for granting the AIP exception was the FDA's recognition that "review may be necessary to avoid a situation in which the statutory 180-day exclusivity blocks approval of any ANDA for atorvastatin." JA1046-47.[5] The memorandum noted that prompt review of Ranbaxy's ANDA could not "guarantee" that it would be ready for final approval by November 30, 2011, but nevertheless "anticipat[ed]" that review of the ANDA could be completed by that date, which was then about 7 months away.

---

[5] The other reasons concerned FDA's conclusion that the compliance issues at Ranbaxy's Paonta Sahib facility were unlikely to have affected Ranbaxy's original or amended ANDA. JA1046.

11

JA1047.

On July 29, 2011, FDA confirmed that Ranbaxy's ANDA was substantially complete when filed in 2002. JA1073-84 (7/29/11 Mem.). It took the unusual step of reconsidering this issue because of the "unusual facts surrounding" Ranbaxy's ANDA. JA1073-75. Had Ranbaxy's ANDA been found incomplete, Ranbaxy would not have been entitled to first-to-file exclusivity. JA1075-76. FDA's conclusion meant that Ranbaxy remained eligible for its first-to-file exclusivity. JA1084. FDA again noted that Ranbaxy had settled with Pfizer for an entry date of November 30, which was "the earliest date Ranbaxy could market its atorvastatin product." JA1074.

Throughout its expedited review of Ranbaxy's ANDA, FDA repeatedly emphasized the significance of Ranbaxy's settlement and the importance of approving generic Lipitor. In a July 27, 2011 "Labeling Approval Summary," FDA's Division of Labeling noted: "The Agency determined that OGD should review this ANDA because of the major amendments, *Ranbaxy's 'Settlement' with Pfizer*, and Ranbaxy's 180 days exclusivity." JA0609 (7/29/11 Labeling Approval) (emphasis added). A Ranbaxy log of FDA communications identified an October 26, 2011, conversation with Bob West in which he reported that November 30 was not "written in stone," but that FDA was "targeting the Nov 30th date" to approve Ranbaxy's ANDA. JA4415. Mr. West's November 7, 2011,

sign-off on approval of Ranbaxy's ANDA noted that expedited review had been granted so that OGD and the Office of Compliance could assess the reliability of the data "prior to the effective [entry] date of the settlement agreement." JA1180. FDA's November 30, 2011, memorandum documented OGD's conclusion that there was no reason to question the reliability of Ranbaxy's ANDA and emphasized that "[t]he reviewers were acutely aware of the sensitivity of this ANDA, not only because of the AIP concern, but also because this is the first generic product for what most regard as the largest blockbuster drug ever." JA1174.

On December 1, 2011, the day after FDA granted approval to Ranbaxy, it granted tentative approval to Teva, one of the other Lipitor ANDA filers. JA1565-69. The approval was tentative because FDA's decision that Ranbaxy was entitled to first-to-file exclusivity meant that Teva's ANDA could not be finally approved until Ranbaxy's six months of first-to-file exclusivity expired. JA1566.

Following its decision to review Ranbaxy's ANDA on an expedited basis, FDA completed the entire review of Ranbaxy's ANDA in about seven months. OGD's work on Ranbaxy's ANDA was underway as of early April 2011. JA0864-67 (4/11/11 email). The three primary scientific review disciplines at FDA completed review of Ranbaxy's ANDA on or before October 25, 2011 – Labeling on July 29, 2011, Quality on October 21, 2011, and Bioequivalence on October 25,

2011.  JA2756-57 (Karst Rpt. ¶ 74).

Thereafter, FDA inspected Ranbaxy's Toansa facility between November 21-25, 2011.  JA4280 (4/2/12 Ltr.).  On November 29, 2011, and December 30, 2011, Ranbaxy provided written responses to some of FDA's facility observations.  *Id.*  FDA thereafter issued its Establishment Inspection Report ("EIR") on April 2, 2012.  *Id.*  However, FDA exercised its discretion to grant final approval of Ranbaxy's ANDA on November 30, 2011 (JA0578-82 (11/30/11 Final Approval Ltr.)), before Ranbaxy provided written responses to FDA's questions or FDA issued its EIR (JA4280-313 (4/2/12 Ltr.)).  Ranbaxy subsequently launched its less expensive generic Lipitor on November 30, 2011, the precise date that Pfizer and Ranbaxy had negotiated in June 2008, almost three-and-a-half years earlier.  JA2756-57 (Karst Rpt. ¶ 74).

There is no dispute that FDA took extraordinary measures to ensure that generic Lipitor was available to the public by the November 30, 2011, agreed date.  Ranbaxy's own expert described FDA's treatment of the Lipitor ANDA as "unique," "unusual," "unprecedented," and "rare."  JA2944 (Troy Rpt. ¶ 120).  He further suggested that FDA's decision to review the ANDA given the AIP was a "potentially unprecedented decision by FDA."  *Id.*  Mr. Karst, Plaintiffs' expert, agreed.  JA2759-61 (Karst Rpt. ¶¶ 82-85).  The disagreement between the experts concerned what would have happened in these unique circumstances had Pfizer

14

and Ranbaxy agreed in June 2008 to an entry date before November 30, 2011.

According to Mr. Troy, FDA would not have approved Ranbaxy's ANDA any

earlier (JA2894-95 (Troy Rpt. ¶ 27)), but according to Mr. Karst:

> FDA prioritized its work on Ranbaxy's ANDA to complete its review by November 30, 2011, and had FDA been informed of an earlier agreed entry date, there is no reason for it not to have similarly prioritized its review to complete it by that earlier date and every reason to believe that it would have. For example, assuming Ranbaxy and Pfizer agreed to a launch date of Tuesday, November 29, 2011, FDA's practice would have been to target approval of Ranbaxy's ANDA 076477 by that date and FDA approval of the ANDA no later than that date would have been highly likely.

JA2734 (Karst Rpt. ¶ 16.C).

### D.  Plaintiffs' Causation Theory

In response to Defendants' summary judgment motion, Plaintiffs submitted

an affidavit pursuant to Fed. R. Civ. P. 56(d) explaining the discovery necessary to

demonstrate when and how generic entry would likely occur absent Pfizer's

reverse payment. JA2439-49. Plaintiffs explained that they would rely on an

expert economic model to demonstrate the generic entry date that would have been

in the economic interests of Pfizer and Ranbaxy had they settled without a reverse

payment. JA2446-48 (Aff. ¶¶ 21-23). The economic model requires various

inputs requiring extensive fact discovery including the forecasted revenues of

Pfizer and Ranbaxy with and without generic entry, the expected time to resolve

the patent litigation, and Pfizer and Ranbaxy's expectations of the outcome of the

patent litigation. *Id.* This kind of model to prove causation has been accepted in various cases since the Supreme Court decided *FTC v. Actavis, Inc.*, 570 U.S. 136 (2013). *See, e.g.*, *In re Opana ER Antitrust Litig.*, No 14 C 10150, 2021 WL 2291067, at *14-15 (N.D. Ill. June 4, 2021); *In re AndroGel Antitrust Litig. (No. II)*, No. 1:09-MD-2084-TWT, 2018 WL 2984873, at *17 (N.D. Ga. June 14, 2018); *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. 14-md-02503, 2018 WL 563144, at *21-23 (D. Mass. Jan. 25, 2018); *United Food & Com. Workers Local 1776 & Participating Emps. Health & Welfare Fund v. Teikoku Pharma USA*, 296 F. Supp. 3d 1142, 1186-90 (N.D. Cal. 2017) ("*Lidoderm*").

Despite the age of this case, Plaintiffs still have not been permitted to complete discovery on the inputs for such an economic model. JA2446-47 (Aff. ¶ 22). Nor were they permitted to explore the bases for public statements made by the Pfizer chairman and CEO that: "There are dozens of generic drug manufacturing companies with a red circle around June 28, 2011. That's the day the patent for [Lipitor] expires" and that "we expect to lose exclusivity on Lipitor in June of 2011." *Id.*

Plaintiffs explained that the no-payment settlement-date output of this economic model would be an input for Plaintiffs' regulatory experts. JA2447-48 (Aff. ¶ 23). Instead of the district court's abstract analysis of whether FDA

16

approval was likely just one day earlier than November 30, 2011, Mr. Karst would have been able to provide specific analysis of what FDA was likely to have done to grant final approval of Ranbaxy's ANDA by the specific no-payment entry date or date range identified by Plaintiffs' expert economist. *Id.*

## II.  Procedural History

Following this Court's reversal of the grant of Defendants' motion to dismiss, the district court ordered that discovery commence on January 12, 2018. JA0334 (ECF 684).  On October 16, 2019, it set a schedule that included dates for class certification and *Daubert* motions but left the dates for summary judgment and trial for further discussion.  JA0352 (ECF 902).

However, the district court had a pattern of using stays and mediation to avoid the merits of this case.  Before the first appeal to this Court, the district court stayed the Direct Class's motion to amend the judgment and ordered all parties to mediate after it had already dismissed the case.  *See* JA0328 (ECF 617).  And, on November 6, 2019, just twenty-one days after issuing the schedule in 2019, the district court abruptly changed course and set a case management conference for February 4, 2020 to identify "a timeframe and procedure for mediation and settlement discussions."  JA0353 (ECF 909).  On March 2, 2020, the district court issued a mediation order, and on March 12, 2020, just six days before the deadline for substantial completion of document production, the district court stayed all

17

discovery for an initial period of two months to permit mediation before the Hon.

Faith S. Hochberg (Ret.).  JA0356-57 (ECF 943 & 948).

The discovery stay was renewed and ultimately remained in effect for almost

two years while the parties engaged in prolonged court-ordered mediation.

JA0358, JA0364 (ECF 958, 1031).  Plaintiffs repeatedly objected that the stay

deprived them of necessary discovery, but their objections were overruled.

JA0356 (2/26/20 Tr.) (expressing concern about entering mediation "blindly"

without discovery); JA0362 (ECF 1011, 11/13/20 Tr. at 35-36, 43-44) (request to

lift stay); *see also* JA0367 (ECF 1066-1, 1/7/22 Status Report) (summarizing

discovery efforts).

Finally, in December 2021, the court scheduled a status conference.  JA0366

(ECF 1056).  Following the conference, then-Defendant Pfizer requested

permission to file a summary judgment motion on the grounds that "Plaintiffs will

not be able to meet [their] burden" of "produc[ing] evidence . . . from which a

reasonable jury could conclude that, in the absence of the alleged reverse payment,

it is more likely than not that Ranbaxy would have obtained FDA approval and

entered earlier than November 30, 2011."  JA0367 (ECF 1068).  Ranbaxy did not

join the request and asked for the proceedings to be limited to class certification.

JA0367 (ECF 1067).

Plaintiffs objected to Defendants' request to phase discovery and summary

18

judgment given that causation is a fact-intensive issue intertwined with the merits and usually inappropriate for summary judgment. JA0367 (ECF 1073-1). Five months later, on June 23, 2022, the presiding magistrate judge granted both Defendants' requests and ordered that the case proceed only as to class certification and summary judgment on the narrow causation issue that Pfizer proposed. JA0021-2 (6/23/22 Order). The order required Plaintiffs to serve expert disclosures by August 26, 2022, just two months later. *Id.* Following Ranbaxy's production in late July 2022 of 2.2 million pages of documents relevant to regulatory causation and class certification, the district court extended the deadline by 90 days. JA0023 (8/15/22 Order); JA0030 (9/29/22 Order).

On July 7, 2022, Plaintiffs appealed the magistrate judge's scheduling order to the district court. They objected to the abbreviated schedule and argued that restricting discovery and summary judgment to Pfizer's narrow causation issue would delay the case and prevent determination of the full extent of their injuries. JA0368 (ECF 1086-1).

On September 1, 2022, after the magistrate judge extended the schedule, Plaintiffs filed a second appeal that pointed out that the motion that Pfizer had proposed could be "defeated by a simple demonstration that FDA could have approved Ranbaxy's ANDA just one day earlier" than November 30, 2011. JA0371-72 (ECF 1114-1). Defendants agreed, but insisted that Plaintiffs could not

make such a showing.  JA0372 (ECF 1120).

On September 29, 2022, the district court denied both of Plaintiffs' appeals. JA0024-32 (9/29/22 Order).

On March 15, 2023, Defendants filed their summary judgment motion with a 165-paragraph statement of undisputed facts.  JA2674-726.  The motion was not limited to the fact-of-injury question that Defendants were granted leave to raise, but also sought summary judgment on the grounds that, if the court denied summary judgment on the fact of injury, it should grant summary judgment limiting Plaintiffs' damages to one day of delay.  JA0379 (ECF 1184).

On May 1, 2023, Plaintiffs responded to Defendants' motion for summary judgment and statement of undisputed facts.  JA5172-241 (ECF 1217, 1217-1). They responded that many of Defendants' facts were immaterial and did not establish what would have happened had Pfizer not paid Ranbaxy to agree to the November 30, 2011, entry date.  *Id.*  Plaintiffs submitted a Rule 56(d) affidavit identifying additional facts that they should have been permitted to discover in order to address the causation issue fully.  JA2439-49.  On May 22, 2023, Defendants filed a reply.  JA0384 (ECF 1235).

## III.  District Court's Opinion

On June 6, 2024, the district court issued an 83-page opinion granting summary judgment to Ranbaxy.  JA0033-115.  Almost two-thirds of the opinion is

20

copied virtually verbatim from Defendants' statement of undisputed facts.

*Compare* JA0036-87 (6/6/24 Op.) *with* JA2674-725 (Defs. 56.1 Statement). The opinion ignored Plaintiffs' Rule 56(d) affidavit explaining the evidence that Plaintiffs would have needed to fully address causation. JA0036-115 (6/6/24 Op.).

Many of the facts that the district court adopted involve issues that Plaintiffs identified as immaterial[6] and events that Plaintiffs asserted would likely occur on different dates absent Pfizer's payment to Ranbaxy to accept the November 30, 2011, entry date. JA5172-241 (Pls. 56.1 Response).[7]

The opinion acknowledged the exceedingly narrow scope of the causation issue on which it granted summary judgment, but agreed with Ranbaxy that "Plaintiffs have failed to create a genuine issue of material fact that it was more likely than not that FDA would have completed its review any sooner and approved Ranbaxy's generic drug manufacturer's ANDA earlier than November

---

[6] Over 70 footnotes cursorily rejected Plaintiffs' position that facts were immaterial to the ultimate issue in the case. *See* JA0038, JA0047-53, JA0056-64, JA0069-71, JA0073-74, JA0080, JA0084-87.

[7] Over 30 footnotes cursorily rejected Plaintiffs' explanations that dates in the actual regulatory history would necessarily be different had Pfizer and Ranbaxy agreed to an entry date earlier than November 30, 2011. *See* JA0043, JA0046, JA0052, JA0055, JA0066-69, JA0073-80, JA0082-84. Most of the footnotes relate back to the district court's claim that Plaintiffs' detailed response to paragraph 33 of Defendants' statement of undisputed facts violated N.J. Local Rule 56.1. JA0046 n.5.

30, 2011 – even by one day – on November 29, 2011." JA0036. It claimed to break the analysis into two sub-questions: "(1) whether FDA would have granted an AIP exception before May 16, 2011 absent the disputed Settlement Agreement and (2) whether Ranbaxy would have obtained final FDA approval earlier than November 30, 2011 absent the disputed Settlement Agreement." JA0090.

However, the district court's analysis collapsed these two questions into one since it concluded that in order "to decide whether Ranbaxy's Lipitor ANDA could have been reviewed and approved earlier by FDA, the Court must assess the AIP process given that absent the AIP exception, any FDA review of Ranbaxy's Lipitor ANDA would have been impossible." JA0091; *see also* JA0109 (concluding that because Ranbaxy's Lipitor ANDA approval was "always conditional upon an AIP exception or complete removal of the AIP," "Ranbaxy's Lipitor ANDA approval was based upon an event completely separate of the date put forward by the disputed Settlement Agreement").

The district court concluded that FDA's knowledge of the November 30, 2011, entry date was insufficient to show that it impacted the date on which FDA granted the AIP exception because "although FDA's knowledge of the November 30, 2011 launch date never changed, FDA took more than two years to grant an AIP exception to Ranbaxy in the first place." JA0094. And, it claimed that the "highly unusual nature of the AIP" rendered Plaintiffs "unable to offer information

other than speculation" concerning whether the AIP could have been granted
earlier. JA0095-96.

The district resolved factual disputes against Plaintiffs. It ignored FDA's
repeated statements that the availability of generic Lipitor, the largest selling drug
in the country, was a public health issue and concluded that evidence in the record
showed that FDA's diligence and concern with drug review would not have been
altered based upon an agreed drug entry date. JA0097. It failed to recognize that
Ranbaxy's 180-day first-to-file exclusivity prohibited final approval of Teva's
ANDA and relied on the FDA's failure to approve Teva's ANDA before
November 30, 2011, as evidence that "FDA's awareness of the availability of an
earlier entry date when handling the same 'blockbuster' drug made no difference in
FDA's approval timeline where there were regulatory mandates in place."
JA0098. It concluded that FDA's targeting of November 30 as an approval date
was not sufficient to create a disputed issue of fact because the exception letter did
not "guarantee" that review of Ranbaxy's ANDA could be completed by
November 30, despite evidence that FDA granted the AIP exception in part to
avoid delaying generic Lipitor. JA0104-05. And, it even speculated that somehow
with an earlier targeted entry date "it is just as likely that the AIP process could
have taken longer to complete, or FDA could have refused to grant the AIP
exception." JA0105.

The district court expressly rejected FDA's approval of generic Lipitor on November 30, the date agreed to almost three and a half years earlier, as evidence that had FDA targeted an earlier date (especially a date just one day earlier), it would have likely also met that date. JA0113. In response to Plaintiffs' argument that FDA's approval on this precise date was not just a "cosmic coincidence," it reasoned that "particularly considering the facts from FDA putting forth the unusual nature of the Ranbaxy Lipitor ANDA, the likelihood of the purported 'cosmic coincidence' appears high." *Id.*

## SUMMARY OF ARGUMENT

The district court was wrong to grant summary judgment on causation. Causation is a factually intense issue that depends upon inferences about what would happen in a hypothetical world but for the antitrust violation. The violation need not be the only cause of Plaintiffs' injury, just a material cause. Such issues are particularly ill-suited for summary judgment in cases like this one where the defendant (for purposes of the motion) does not dispute the antitrust violation. As an assumed antitrust violator, Ranbaxy was not entitled to insist on absolute certainty about what would have happened but for its violation. Requiring such certainty would permit antitrust violators to benefit from the uncertainty caused by their own wrongdoing.

That is precisely what the district court allowed. As in its opinions

24

improperly dismissing Plaintiffs' complaints, it imposed additional burdens on Plaintiffs with no support in the law or facts. Instead of lightening Plaintiffs' burden given the assumed antitrust violation, it required Plaintiffs to muster evidence at summary judgment that "guaranteed" that FDA would have granted earlier generic entry absent the illegal reverse payment. And, it increased Plaintiffs' burden further by adopting virtually all of Defendants' facts as undisputed and refusing to consider arguments about why FDA was likely to have approved Ranbaxy's ANDA earlier had it targeted an earlier no-payment entry date.

In particular, the district court required Plaintiffs to prove that FDA would have granted the AIP exception earlier than May 11, 2011. But that issue was irrelevant to the narrow issue before the court. Had Pfizer and Ranbaxy agreed to an entry date just one day earlier than November 30, it is likely that FDA would have targeted that earlier date and been able to shave off at least a day from the seven-month period between May 11, when FDA documented its decision to grant the exception, and November 30.

It is exceedingly *un*likely that FDA's approval of Ranbaxy's ANDA on the very date agreed to by Pfizer and Ranbaxy almost three and a half years earlier was just a "cosmic coincidence" as the district court mused. The only thing special about November 30 was that it was the date agreed to by Pfizer and Ranbaxy.

25

FDA approved Ranbaxy's ANDA by that date because FDA explicitly targeted it, just as it would have targeted an earlier entry date agreed to by Pfizer and Ranbaxy.

FDA regulatory approval is not like the patent bar that this Court considered in *In re Wellbutrin XL Antitrust Litigation*, 868 F.3d 132 (3d Cir. 2017). Unlike the third-party patent in *Wellbutrin*, which existed independently of the alleged violation, FDA approval was not independent of the violation. Plaintiffs' evidence shows that the November 30, 2011, entry date that Pfizer paid Ranbaxy to accept was a material factor in the timing of FDA's review and final approval of Ranbaxy's ANDA.

Even if it were necessary for Plaintiffs to show that the AIP exception would have been earlier but for the reverse payment, Plaintiffs have evidence that the agreed entry date was a material factor in the timing of the AIP exception. From the time that FDA invoked the AIP until it granted the exception, FDA made clear that an exception would be granted in the interests of "public health." And, FDA viewed the failure to approve generic Lipitor by the earliest possible date as a serious threat to public health.

Finally, the district court's bifurcation order carving out the issue of FDA approval for discovery and summary judgment was an abuse of discretion. It was inefficient and wasteful to impose this discovery limit in a ten-year-old case that

had been stayed for mediation for two years over Plaintiffs' objection. Moreover, the order substantively prejudiced Plaintiffs. As they pointed out in opposition to the proposed bifurcation order, and in the Rule 56(d) affidavit submitted in opposition to summary judgment, the hypothetical question of causation is intertwined with the merits. Plaintiffs' regulatory expert could not provide a concrete analysis of the alternative date or date ranges because Plaintiffs' economic analysis was outside the scope of permitted discovery. As a result, the district court decided an abstract issue about the timing of FDA approval divorced from any appreciation of how it related to the merits of the case and without the benefit of a regulatory analysis based on the hypothetical alternative entry date or date ranges that Plaintiffs would present to a jury.

## STANDARD OF REVIEW

This Court's review of a district court's grant of summary judgment is plenary. *See, e.g.*, *Young v. Martin*, 801 F.3d 172, 177 (3d Cir. 2015). This Court applies the same standard as the district court and "will affirm only if 'drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and [] the moving party is entitled to judgment as a matter of law.'" *Id.* (citation omitted). The nonmoving party "cannot avert summary judgment with speculation or conclusory allegations" and must cite the record. *King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, 88 F. Supp. 3d 402, 410 (E.D.

Pa. 2015). However, it "need not match, item for item, each piece of evidence proffered by the movant" to raise a genuine issue of material fact. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

This Court's review of a district court order restricting discovery is for abuse of discretion. *Arnold Pontiac-GMC, Inc. v. Gen. Motors Corp.*, 786 F.2d 564, 568 (3d Cir. 1986). "The grant of summary judgment . . . before the plaintiff has had a full opportunity for discovery, however, may constitute reversible error." *Id.* The failure to consider a Rule 56(d) affidavit is an abuse of discretion. *Shelton v. Bledsoe*, 775 F.3d 554, 568 (3d Cir. 2015).

## ARGUMENT

### I.   CAUSATION IS PARTICULARLY ILL-SUITED FOR SUMMARY JUDGMENT.

To recover damages under section 4 of the Clayton Act, 15 U.S.C. § 15, a plaintiff must establish a "causal connection" between the antitrust violation and the damages suffered. *Callahan v. A.E.V., Inc.*, 182 F.3d 237, 250 (3d Cir. 1999). Whether such a causal link exists "is normally a question of fact for a jury." *Rivas v. City of Passaic*, 365 F.3d 181, 193 (3d Cir. 2004). *See also Callahan*, 182 F.3d at 257 (recognizing that alternative explanations of injury are "issues of fact best left to the jury," not reasons for finding "insufficient evidence of causation as a matter of law").

A plaintiff need not establish the antitrust violation as the only cause of its injury. A plaintiff need show only that defendant's violation was a "material cause" of injury. *Am. Bearing Co. v. Litton Indus., Inc.*, 729 F.2d 943, 952 (3d Cir. 1984); *In re Flonase Antitrust Litig.*, 798 F. Supp. 2d 619, 627 (E.D. Pa. 2011). That means that the antitrust violation must be a proximate cause. *2660 Woodley Rd. Joint Venture v. ITT Sheraton Corp.*, 369 F.3d 732, 740 (3d Cir. 2004). In other words, the alleged injury must not be too remote to be fairly attributed to the antitrust violation. *Allegheny Gen. Hosp. v. Philip Morris, Inc.*, 228 F.3d 429, 439-41 (3d Cir. 2000). To break the causal connection, an independent cause must fully account for the plaintiff's alleged injury. *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 114 n.9 (1969). The patent in *Wellbutrin XL*, 868 F.3d 132, held by a third party not involved in the alleged reverse payment, is an example of such an intervening cause. Typically, questions of proximate cause and intervening cause are not issues appropriately addressed on summary judgment. They are "usually issues for the jury to resolve." *Wortley v. Camplin*, 333 F.3d 284, 295 (1st Cir. 2003).

In antitrust cases, the causation analysis is necessarily hypothetical. *Affiliated Capital Corp. v. City of Houston*, 735 F.2d 1555, 1564 (5th Cir. 1984), *overruled on other grounds by City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 383 (1991). The jury must determine what was likely absent

29

defendant's violation. Plaintiffs typically rely on expert witnesses and other evidence to answer such hypothetical questions. *See In re Domestic Drywall Antitrust Litig.*, 322 F.R.D. 188, 224-25 (E.D. Pa. 2017); *In re Linerboard Antitrust Litig.*, 497 F. Supp. 2d 666, 669-70, 676-83 (E.D. Pa. 2007).

Upon proof of a violation, the burden of proving antitrust injury is "lightened" because "[t]he vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation." *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566-68 (1981). "Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim. . . . The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264-65 (1946). Thus, "plaintiffs enjoy a considerable amount of leeway in 'constructing a hypothetical world free of the defendant['s] exclusionary activities.'" *Univac Dental Co. v. Dentsply Int'l, Inc.*, No. 1:07-CV-0493, 2010 WL 1816745, at *3 (M.D. Pa. Apr. 27, 2010) (citation omitted).

Where, as on the motion before the district court, the antitrust violation is assumed, "the inferential leap to the finding of fact of damage, is not great." *Malcolm v. Marathon Oil Co.*, 642 F.2d 845, 855 (5th Cir. 1981). *See also Bigelow*, 327 U.S. at 264 (in antitrust cases, a jury may properly "conclude as a

matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business . . . that defendants' wrongful acts had caused damage to the plaintiffs"); *Linerboard*, 497 F. Supp. 2d at 675 ("In price-fixing cases, 'causation of injury may be found as a matter of just and reasonable inference from proof of defendants' wrongful acts and their tendency to injure plaintiffs, and from evidence of change in prices not shown to be attributable to other causes.'").

## II. PLAINTIFFS IDENTIFIED SUBSTANTIAL EVIDENCE THAT DEFENDANTS' VIOLATION CAUSED SOME DELAY OF FDA'S APPROVAL OF GENERIC LIPITOR.

Plaintiffs identified substantial evidence that the November 30, 2011, entry date that Pfizer paid Ranbaxy to accept played a material role in the date on which FDA granted final approval of Ranbaxy's ANDA. Pfizer and Ranbaxy executed the settlement agreement containing the reverse payment that Plaintiffs challenge on June 17, 2008. JA3303-411. Almost three and a half years later, on November 30, 2011, the precise date that Pfizer paid Ranbaxy to accept, FDA approved Ranbaxy's ANDA. The clear inference from these facts alone is that, had Pfizer and Ranbaxy agreed to an earlier entry date without the reverse payment, FDA would have also successfully targeted that earlier date.

Rejecting this clear inference – like it rejected the clear inferences from Plaintiffs' allegations in the motion to dismiss opinions that this Court reversed

seven years ago – the district court imposed unprecedented burdens on Plaintiffs without any basis in facts or law.  It concluded that "Ranbaxy's Lipitor ANDA approval was based upon an event completely separate of the date put forward by the disputed Settlement Agreement."  JA0109.  It then decided that it was more likely than not that it was a "cosmic coincidence" that FDA approved Ranbaxy's ANDA on the precise date that Pfizer and Ranbaxy negotiated years before. JA0113.  Nothing could be further from the facts.

### A.   Plaintiffs Did Not Need to Prove that the AIP Exception Would Have Been Granted Earlier to Establish That Ranbaxy's Violation Caused Some Delay.

Preliminarily, the district court held that, to defeat summary judgment, Plaintiffs had to show that FDA would have granted the AIP exception earlier because "absent the AIP exception, any FDA review of Ranbaxy's Lipitor ANDA would have been impossible."  JA0091.  It asserted that there could be no earlier FDA approval of Ranbaxy's ANDA because Ranbaxy's ANDA approval "was wholly predicated" upon the grant of the AIP exception.  JA0109.  This reasoning was deeply flawed.

In overruling Plaintiffs' objection to phased discovery, the district court limited summary judgment to the question of whether Pfizer's reverse payment had any impact at all on the date that FDA granted final approval, *i.e.*, whether it is more likely than not that FDA would have approved Ranbaxy's ANDA even one

day earlier had Pfizer and Ranbaxy agreed on such a date absent Pfizer's payment. JA0024-32 (9/29/22 Order). Hence, the only issue at summary judgment should have been whether there was sufficient evidence for a jury to find that it was more likely than not that FDA would have approved Ranbaxy's ANDA on November 29, 2011, if that were the date that Pfizer and Ranbaxy negotiated absent payment, and FDA had targeted it from the time that it granted the AIP exception. This issue did not require the date of the AIP exception to move at all.

In the actual world, there were about seven months between May 11, 2011, when FDA documented its grant of an exception to the AIP, and FDA's approval of Ranbaxy's ANDA on November 30. The only issue that the district court needed to consider was whether a jury could find that FDA would have been able to shave off one day from this period. The record facts show that it clearly could have done so. All FDA divisions had completed the substantive reviews of Ranbaxy's ANDA by October 25, 2011, and the Toansa facility inspection was targeted to occur, and did occur, before November 30, 2011. JA2756-57 (Karst Rpt. ¶ 74); JA1172 (11/30/11 Mem.).

The district court's requirement that Plaintiffs reconstruct the entire regulatory process and guarantee that FDA would have granted the AIP exception earlier gave the benefit of the doubt to Ranbaxy. The district court should have assumed that Ranbaxy violated the antitrust laws on this limited motion, and

Supreme Court precedent required it to give the benefit of the doubt to Plaintiffs,

not the antitrust violator. *See supra* pp. 30-31.

### B. Most of the Facts That the District Court Recited in Its Opinion Were Immaterial or Disputed.

The district court also improperly rejected the factual disputes that Plaintiffs

identified. The first two-thirds of the district court's opinion are copied virtually

verbatim from the facts in Defendants' Local Rule 56.1 statement despite the

contrary facts that Plaintiffs identified.

The district court rejected Plaintiffs' argument that: "Had Ranbaxy agreed to

an earlier entry date with Pfizer, FDA would have targeted an earlier date to

complete review of Ranbaxy's Lipitor." JA0045 (citing Pls. 56.1 Resp. ¶ 33).

Plaintiffs cited specific facts in response to paragraph 33 of Defendants' statement

that showed why the dates in the but-for world would be different. In particular,

they cited facts demonstrating that FDA was aware of the November 30, 2011,

negotiated entry date, specifically targeted it for approval of Ranbaxy's ANDA,

and viewed the failure to approve a generic version of the largest blockbuster brand

drug ever by the earliest permitted entry date as a significant public health issue.

JA5182-90 (Pls. 56.1 Resp. ¶ 33). Plaintiff incorporated these facts into

subsequent responses. *See* JA5200, JA5214, JA5221-29, JA5231-34. However,

the district court held that Plaintiffs should have submitted a separate supplemental

statement of disputed facts in accordance with Local Rule 56.1, that it was

improper for Plaintiffs to make a statement in response to Ranbaxy's fact statement

that was at "the heart of this motion for summary judgment," and that Plaintiffs'

responses improperly required it to "go through the responses line by line to

determine" where Plaintiffs had blurred "the line between fact and opinion."

JA0045.

The district court's failure to consider Plaintiffs' facts and the reasonable

inferences that could be drawn from them in Plaintiffs' favor is at the core of its

error.  It adopted the actual timeline for FDA approval as undisputed and made no

attempt to consider the inferences that a jury could draw about what was likely had

Pfizer and Ranbaxy agreed to an earlier entry date.

Moreover, Plaintiffs did not violate the local rules.  Local Rule 56.1 provides

an option to provide a supplemental statement of fact.  It is not a requirement.  *See*

*Pastavalava v. Wolf*, No. 1:19-cv-09211-NLH, 2020 WL 6883433, at *3 n.3

(D.N.J. Nov. 24, 2020); *Kalmus v. Flagship Resort Dev. Corp.*, No. 3:16-cv-1771-

BRM-TJB, 2018 WL 4144691, at *1 n.2 (D.N.J. Aug. 30, 2018).  District courts

generally do not rely on Local Rule 56.1 to ignore disputed facts identified by a

responding party.  *Hawkins v. Globe Life Ins. Co.*, 105 F. Supp. 3d 430, 437-38

(D.N.J. 2015) (considering facts identified in brief rather than in supplemental

Rule 56.1 statement); *Noble v. City of Camden*, 112 F. Supp. 3d 208, 217 n.3

35

(D.N.J. 2015) (considering opinions in submitted expert report not included in supplemental Rule 56.1 statement).

Even had Plaintiffs violated Local Rule 56.1, this Court has held the grant of summary judgment as punishment for technical violations of Local Rule 56.1 to be inconsistent with the requirement at summary judgment that federal courts "view the facts in the light most favorable to the non-moving party." *Boswell v. Eoon*, 452 F. App'x 107, 112 (3d Cir. 2011); *see also Integon Nat'l Ins. Co. v. Rodriguez*, No. 22-3280 (RK) (JBD), 2024 WL 3634193, at *5 (D.N.J. Aug. 2, 2014) (recognizing that this Court has "cautioned against using R. 56.1 as a punishment"). Accordingly, the district court should not have simply adopted the actual FDA regulatory timeline as undisputed. It should have considered whether the evidence would permit a jury to find that FDA would have likely approved Ranbaxy's ANDA earlier had Pfizer and Ranbaxy agreed to an earlier no-payment generic entry date.

### C. The Facts Show that FDA Likely Would Have Granted Final Approval Earlier Had Ranbaxy Agreed on an Earlier No-Payment Entry Date.

According to the district court, Ranbaxy was entitled to summary judgment because "the question of an earlier ANDA approval . . . requires the Court to guess what FDA would have done had the launch date for generic Lipitor been different." JA0106. The evidence does not require guesswork. Had Pfizer and

Ranbaxy agreed in June 2008 to an entry date of November 29, 2011 – just one day

earlier than the actual date – there is substantial evidence for a jury to find that

FDA would have targeted that earlier date and would have succeeded in approving

Ranbaxy's ANDA by that targeted date.  All scientific review disciplines at FDA

signed off on Ranbaxy's ANDA by October 25, 2011.  JA1180 (11/7/11 OGD

Approval); *see also* JA2756-57 (Karst Rpt. ¶ 74).  The only remaining issue was

the inspection of Ranbaxy's Toansa plant scheduled for November 21-25.  JA1172

(11/30/2011 Mem.).  Although FDA conducted this inspection before November

30, it did not issue its EIR until April 2, 2012, following Ranbaxy's submission of

additional information on November 29 and December 30, 2011.  JA4280-313

(4/2/12 Ltr.).

     These actual events demonstrate FDA's efforts to approve generic Lipitor by

the agreed-upon generic entry date.  Approval by the agreed date was so important

to FDA that it did not delay approval until it received Ranbaxy's December 30,

2011, response to its outstanding questions or issued the EIR in April 2012.  Had

November 29, 2011, been the date that Pfizer and Ranbaxy negotiated absent the

challenged reverse payment, FDA likely would have targeted that date as well and

likely would have succeeded in completing its review of Ranbaxy's ANDA by that

date.  All FDA would have had to do is shave off one day from the roughly seven-

month period between the time that FDA documented its grant of the AIP

exception in May 2011 and the actual approval date on November 30, 2011.

The November 30 date and the importance of access to generic Lipitor for public health were front and center in FDA's management of the approval process. Ranbaxy's log of FDA communications identified an October 26, 2011, conversation in which Mr. West repeatedly reported that FDA was "working and targeting the Nov 30th date" for approval of Ranbaxy's ANDA. JA4415. Mr. West's November 7, 2011, sign-off on the approval of Ranbaxy's ANDA noted that the AIP exception was granted to permit OGD and OC to assess the reliability of the data, and expedited review status was granted to permit the determination "prior to the effective date of the settlement agreement." JA1180. FDA's November 30, 2011, memorandum documenting OGD's decision to grant final approval reinforced that FDA's "reviewers were acutely aware of the sensitivity of this ANDA, not only because of the AIP concern, but also because this is the first generic product for what most regard as the largest blockbuster drug ever." JA1174.

These circumstances are starkly different from those in *Wellbutrin XL* to which the district court analogized. In *Wellbutrin XL*, this Court held that there was sufficient evidence at summary judgment to find that brand manufacturer GSK made a large and unjustified reverse payment in the form of a no-AG agreement to generic manufacturer Anchen regarding 150 mg Wellbutrin XL. 868 F.3d at 161-

38

62.  However, it held GSK was entitled to summary judgment because Andrx, a third party, owned a blocking patent that would have prevented Anchen from launching generic Wellbutrin XL.  *Id.* at 165.  This Court held that the blocking patent was an independent legal bar that broke any chain of causation between GSK's reverse payment to Anchen and any harm to the plaintiffs from delayed generic Wellbutrin XL.  *Id.*  While the *Wellbutrin XL* plaintiffs offered theories as to how Anchen may have launched despite Andrx's blocking patent, they had no evidence to support those theories.  *Id.* at 167.

Unlike the patent in *Wellbutrin XL*, FDA approval of Ranbaxy's ANDA was not an independent bar that broke the chain of causation.  *See In re Zetia (Ezetimibe) Antitrust Litig.*, 655 F. Supp. 3d 406, 432 (E.D. Va. 2023) (distinguishing *Wellbutrin XL* on the grounds that the patent holder was not a party to the reverse payment).  Also unlike *Wellbutrin XL*, Plaintiffs are not proposing a counter-factual scenario.  In the but-for world, FDA would have acted just like it did in the actual world, except that it would have targeted an entry date earlier than November 30.  Given the limits imposed by the district court, it must be assumed that Pfizer's reverse payment was made to induce Ranbaxy to accept the November 30 entry date.  And, that date was a material factor in the timing and execution of FDA's approval process.  In similar cases, lower courts have held that FDA approval does not break the causal chain where the antitrust violation delayed

39

the regulatory approval process. *See, e.g.*, *Value Drug Co. v. Takeda Pharms., U.S.A., Inc.*, No. 21-3500, 2022 WL 952896, at *7 n.48 (E.D. Pa. Mar. 30, 2022) (holding that "when a defendant has engaged in conduct to delay regulatory approval in some manner, antitrust injury is met"); *Takeda Pharm. Co. Ltd. v. Zydus Pharms. (USA) Inc.*, 358 F. Supp. 3d 389, 398 (D.N.J. 2018) (following various district courts in this Circuit declining to "hold that the absence of FDA approval creates a barrier to establishing the element of causation in a patent antitrust suit"); *Flonase*, 798 F. Supp. 2d at 631 (denying summary judgment on causation where evidence raised genuine issue of fact on whether the regulatory decision was caused by the antitrust violation and whether FDA's decision was a foreseeable consequence of the claimed antitrust violation); *see also In re Zetia (Ezetimibe) Antitrust Litig.*, MDL No. 2:18-md-2836, 2022 WL 4355149, at *24 (E.D. Va. Sept. 2, 2022) (recommending denial of summary judgment motion on causation where plaintiffs' experts "opine[d] on reasonable dates for expected regulatory approval in a But-For World that was untainted by the delayed entry date fixed in the allegedly anticompetitive Settlement Agreement"), *report and recommendation adopted by* 655 F. Supp. 3d 406 (E.D. Va. 2023).

Mr. Karst, Plaintiffs' FDA regulatory expert, agreed that had FDA targeted an entry date of November 29, 2011, "FDA's practice would have been to target approval of Ranbaxy's ANDA 076477 by that date and FDA approval of the

ANDA no later than that date would have been *highly likely*." JA2734 (Karst Rpt. ¶ 16.C) (emphasis added). Courts routinely allow experts to apply their regulatory expertise to opine on whether and when FDA would grant earlier approval to ANDAs absent the alleged anticompetitive behavior. *See, e.g.*, *King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, No. 2:06-cv-1797, 2015 WL 12645764, at *4 (E.D. Pa. Dec. 22, 2015); *In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152, 182-84 (S.D.N.Y. 2018); *La. Wholesale Drug Co. v. Sanofi-Aventis*, No. 07 CV 7343(HB), 2008 WL 4580016, at *6 (S.D.N.Y. Oct. 14, 2008).

Ranbaxy's regulatory expert, Mr. Troy, reviewed the same regulatory history as Mr. Karst, recognized the "unique" circumstances surrounding Ranbaxy's ANDA, and even referred to FDA's decision to review the ANDA given Ranbaxy's regulatory problems as a "potentially unprecedented decision by FDA." JA2944 (Troy Rpt. ¶ 120). Nevertheless, Mr. Troy concluded that FDA would not have acted any differently if the agreed-upon entry date had been November 29 or some earlier date. JA2894-97 (Troy Rpt. ¶¶ 26-32).

Mr. Troy's conclusion is not undisputed. A jury would be entitled to infer from FDA's unique efforts with respect to generic Lipitor that FDA would have targeted an earlier date for approval just like it targeted November 30. In order to successfully approve Ranbaxy's ANDA by that earlier date, FDA would have marshalled the resources necessary to complete review of Ranbaxy's ANDA by the

earlier date, and likely would have succeeded just as it succeeded in the actual

world.  The district court ignored the disputed inferences from the factual record

and this battle of experts, but the dispute is for the jury alone to resolve.  *See*

*Lansford-Coaldale Joint Water Auth. v. Tonolli Corp.*, 4 F.3d 1209, 1216 (3d Cir.

1993) (holding that "in a battle of the experts, the factfinder 'decide[s] the

victor'").

### D.    The District Court Improperly Resolved Disputed Facts Against Plaintiffs.

The district court repeatedly resolved disputed issues *against* Plaintiffs based

on its own assessment of the evidence.  It found FDA's May 11 Exception Memo

and the October 2011 Ranbaxy note about the phone call with Mr. West to be

"helpful in evaluating" what FDA would have done had Pfizer and Ranbaxy

agreed to an earlier entry date.  JA0107.  It rejected the inference that FDA likely

would have targeted any agreed entry date and likely would have met any such

earlier date (especially if the agreed date were only one day earlier).  Instead, it

drew adverse inferences from these documents to support its conclusion that

FDA's approval of Ranbaxy's ANDA on precisely the date agreed to by Pfizer and

Ranbaxy years before should not even be considered by a jury as evidence that

FDA would have met an alternative date.  The court concluded that given "the

unusual nature of the Ranbaxy Lipitor ANDA," "the likelihood" of this being

42

simply a "cosmic coincidence" was "high."  JA0113.  None of the inferences that the district court drew in Ranbaxy's favor was warranted on summary judgment.

First, the district court rejected any inference that FDA would have worked to approve generic Lipitor by an earlier date because it claimed that the AIP Exception Memo shows that Ranbaxy's Lipitor ANDA approval "was always conditional upon an AIP exception or complete removal of the AIP" and there was "no substantive showing that the November 30, 2011 date had any bearing upon the AIP period and the exception Ranbaxy was eventually granted."  JA0109.  This argument is logically and factually flawed.  Logically, the claim that FDA could not approve Ranbaxy's ANDA without granting an AIP exception has no bearing on whether FDA would have targeted and succeeded in granting earlier approval *once* it granted the AIP exception.  There were about seven months between May 11 when FDA documented its grant of the exception and the actual agreed-upon date of November 30.  There is no reason why FDA's urgency to approve generic Lipitor would not have motivated it to shave at least a day (or more) off of that approval period had Pfizer and Ranbaxy agreed to an earlier date.  Factually, the district court's conclusion that the grant of the AIP exception was separate from the agreed-upon November 30, 2011 date is wrong.  FDA and the subsequent generic ANDA filers seeking to leapfrog Ranbaxy to get to market were at all relevant times aware of that date, and their actions were driven by it.  *See infra* pp.

43

47-52.

Second, the district court concluded that even had FDA targeted an earlier entry date, there "is no evidence to suggest that FDA's review process would have been faster" because the AIP Exception Memo did not "guarantee" FDA approval by November 30. JA0109. The requirement that Plaintiffs show that earlier entry was guaranteed is contrary to the law. Once a plaintiff proves a violation (as must be assumed on Ranbaxy's limited motion), the burden of proving antitrust injury is "lightened" because "[t]he vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation." *Truett Payne*, 451 U.S. at 566-68. The district court's insistence on guaranteed approval would enable wrongdoers to profit at the expense of their victims by taking advantage of the uncertainty caused by their wrongdoing. *Bigelow*, 327 U.S. at 264-65.

Instead of lightening Plaintiffs' burden given the assumed violation, the district court speculated in *favor* of the assumed wrongdoer that had FDA targeted an *earlier* date, "it is just as likely that the AIP process could have taken *longer* to complete, or FDA could have refused to grant the AIP exception." JA0105 (emphasis added). The district court made no effort to explain its illogical rationale that targeting an earlier date could extend the approval process.

The district court pointed to the "unusual" circumstances of Ranbaxy's

44

ANDA as a reason why it is impossible to conclude with certainty what FDA would have done had Pfizer and Ranbaxy negotiated an earlier generic entry date. JA0111-13. But Plaintiffs need not prove causation with "certainty." *See supra* p. 30. In this case involving the biggest blockbuster pharmaceutical of all time, FDA was laser focused on insuring that its approval process did not deprive the public of generic Lipitor by even a single day. *See supra* pp. 37-38. A jury that concluded that Pfizer violated the law by paying Ranbaxy to agree to a late entry date and that a no-payment entry date would be earlier could rely on the unique circumstances and value of Lipitor to conclude that FDA would act in the but-for world just as it did in the real world to marshal the necessary resources to approve generic Lipitor by the negotiated entry date.

The district court further speculated in Ranbaxy's favor by concluding from FDA's failure to approve ANDAs for other blockbuster drugs by the earliest possible launch date (JA0113) that there was no evidence that FDA would have approved Ranbaxy's ANDA even one day earlier than November 30. But there is no record evidence about why FDA did not grant approval of the other ANDAs that the district court identified at the earliest possible date. Moreover, the other ANDAs are not good benchmarks; the record is undisputed that the Lipitor ANDA was unique and "unprecedented." Given the unique importance of Lipitor, the FDA took "unprecedented" actions to get generic Lipitor to the market by no later

45

than its negotiated entry date.

Finally, FDA's tentative approval of Teva's ANDA on December 1, 2011, the day after it approved Ranbaxy's ANDA, did not justify the district court's conclusion that FDA did not prioritize its review to make sure that generic Lipitor was on the market as soon as possible. *See* JA1565-69 (12/1/11 Tentative Approval Ltr.). While Teva may have had an agreement with Pfizer that technically provided for a launch date before Ranbaxy's, it was barred by statute from launching before expiration of Ranbaxy's 180-day first-to-file exclusivity. JA1566 (12/1/11 Tentative Approval Ltr.). Accordingly, once FDA determined that Ranbaxy was entitled to maintain its exclusivity (JA0579) (11/30/11 Final Approval Ltr.), Teva could not launch until Ranbaxy's exclusivity expired.

### III. PLAINTIFFS ALSO IDENTIFIED SUBSTANTIAL EVIDENCE THAT RANBAXY'S VIOLATION CAUSED DELAY OF THE AIP EXCEPTION.

Even if the district court were correct in requiring that Plaintiffs demonstrate that FDA would have granted the AIP exception earlier had Pfizer not paid Ranbaxy to accept the November 30, 2011, entry date, Plaintiffs have such evidence. The record shows that FDA did not regard its AIP as an absolute bar to review and approval of Ranbaxy's ANDA. Notwithstanding the AIP, FDA consistently asserted its right to act on Ranbaxy's ANDA if it were in the interests of public health. As the November 30, 2011, date approached, FDA pursued a

46

multi-pronged approach designed to get generic Lipitor on the market by that date.

Had that agreed date been earlier, it is likely that FDA's efforts, including the grant

of the AIP exception, also would have been earlier.

When FDA invoked its AIP against Ranbaxy's manufacturing facility in

Paonta Sahib, it told Ranbaxy that its policy once the AIP was invoked was not to

conduct or continue any normal scientific review of any pending application or

supplement containing data from the affected site until the compliance issues had

been resolved and the data or information found reliable.  JA1512 (2/25/09 Mem.).

At the same time, it told Ranbaxy that "[i]n the case of certain applications,

however, [FDA] may review and act on an application prior to completion of the

validity assessment in special circumstances where such an action is clearly in the

interest of public health."  *Id.*

The district court concluded that FDA's "commitment to ensuring the safety

of drugs on the market for consumers" (JA0098-99) meant that FDA would not

have approved Ranbaxy's ANDA even one day earlier had Pfizer and Ranbaxy

agreed to such an entry date.  This understanding of FDA's role in approving

ANDAs was incomplete.  The record shows that FDA explicitly considered the

availability of generic Lipitor as a public health issue.  When it approved

Ranbaxy's ANDA, it noted in its November 30, 2011, memorandum that all of the

"reviewers were acutely aware of the sensitivity of this ANDA, not only because

of the AIP concern, but also because this is the first generic product for what most regard as the largest blockbuster drug ever." JA1174.

The evidence does not support the district court's conclusion that grant of the AIP exception was entirely separate from the assumed antitrust violation. The November 30 entry date for which Pfizer illegally paid Ranbaxy was at the heart of FDA's multi-pronged effort to ensure that the public had access to safe and effective low-cost generic Lipitor on the first day possible. As the November 30, 2011, entry date approached, other generic manufacturers with Lipitor ANDAs recognized that FDA's failure to approve Ranbaxy's Lipitor ANDA could prevent the approval of their own ANDAs. JA1074 (Teva) (7/29/11 Mem.); JA4233-45 (Apotex); JA4272-78 (Matrix/Mylan). Consequently, they wrote to FDA asking it to declare Ranbaxy ineligible for the 180-day first-to-file exclusivity because of the AIP. JA1074 (7/29/11 Mem.). The manufacturers' letters specifically emphasized Ranbaxy's agreed entry date of November 30, 2011. JA4236 (Apotex); JA4274 (Matrix/Mylan).

In his February 17, 2011 internal email, Mr. West wrote to the various FDA "Atorvastatin Teams" to marshal FDA's resources to be prepared for the various potential paths for FDA approval of generic Lipitor. JA2116-7. The email shows that FDA was aware of and considered the negotiated entry dates of all of the potential sellers of generic Lipitor. Mr. West noted that Teva and Mylan/Matrix

48

potentially had authority from Pfizer to launch in June 2011, that Ranbaxy's negotiated entry date was November 30, 2011, and that Watson had the right to market an authorized generic beginning on November 30, 2011. *Id.*

Mr. West discussed the various paths to approving generic Lipitor with senior FDA personnel because of "the unique nature and medical necessity of Atorvastatin Calcium Tablets." JA2116. He talked to Keith Webber, Acting Director of OGD and OGD counsel, and FDA's OPS and CDER. All agreed that OGD needed "to be prepared to take an action no matter what the outcome of the Ranbaxy 180-day eligibility decision." *Id.* Accordingly, Mr. West noted that OGD would grant "'expedited review' status" to the Teva and Matrix ANDAs and that it also expected to grant "'expedited review' status" to Ranbaxy's ANDA. *Id.* In making this recommendation, Mr. West specifically recognized that Ranbaxy was eligible for 180-day exclusivity and that it was subject to the AIP policy. *Id.* Nevertheless, FDA marshalled its resources to ensure that FDA review did not deprive the public of low-cost generic Lipitor on the first available date.

Mr. West's April 8, 2011, memorandum memorialized the decision to grant expedited review status to the ANDAs of the subsequent generic ANDA filers. JA2096-99. It specifically noted that November 30, 2011, was the earliest that Ranbaxy could launch and that its first-to-file exclusivity could block other generic entrants until the end of May 2012. JA2097. However, it also noted the requests

of the subsequent manufacturers that FDA declare Ranbaxy ineligible for the 180-day exclusivity because of the AIP. *Id.* While the memorandum did not address Ranbaxy's eligibility for exclusivity nor the approvability of Ranbaxy's ANDA, it explained FDA's decision to grant expedited review of the ANDAs of the subsequent generic ANDA filers. It recognized that the circumstances did not "fit squarely" within those previously recognized by OGD in its policy and procedures as warranting expedited review, but that circumstances warranted such review. JA2096 n.1. The "size of the market demand for this drug product" was one circumstance warranting expedited review. *Id.* Such expedited review was consistent with FDA's "long-term goal of reviewing pending ANDAs in such a manner that, by the time . . . barriers to approval have expired, appropriate reviews will have been completed." *Id.* Mr. West concluded that the workload of OGD should be managed to "take into account these unusual circumstances and the possibility that Ranbaxy may lose its claim for exclusivity either by relinquishing it or by an agency determination that Ranbaxy is not eligible for exclusivity, *e.g.*, because Ranbaxy's ANDA was not 'substantially complete' at the time of its submission." JA2097.

On May 11, 2011, FDA issued its memorandum explaining why it granted an exception from the AIP for Ranbaxy's ANDA. JA1043-48. This memorandum shows that the decision to grant an exception to the AIP was *not* entirely separate

from the entry date that Pfizer paid Ranbaxy to accept. It again specifically noted that November 30, 2011, was "the earliest date Ranbaxy could market its atorvastatin product under its 2008 settlement agreement with Pfizer" and that "[i]f Ranbaxy were to retain eligibility for [180-day] exclusivity, obtain approval of its ANDA, and market immediately, its exclusivity would expire at the end of May 2012." JA1045. FDA anticipated that its review could be completed by November 30, 2011. JA1047. Although its reasons for granting the AIP included whether Ranbaxy's compliance issues affected the ANDA's reliability, they also included FDA's express recognition that "review may be necessary to avoid a situation in which the statutory 180-day exclusivity blocks approval of any ANDA for atorvastatin." JA1046-47.

A July 27, 2011, "Labeling Approval Summary" unambiguously noted: "The Agency determined that OGD should review this ANDA because of the major amendments, *Ranbaxy's 'Settlement' with Pfizer*, and Ranbaxy's 180 days exclusivity." JA0609 (7/29/11 Labeling Approval) (emphasis added). FDA's memorandum of July 29, 2011, re-affirming that Ranbaxy's ANDA was substantially complete when filed (as required for it to retain its first-to-file exclusivity), emphasized the "unusual facts surrounding" Ranbaxy's ANDA and that the November 30 settlement date was "the earliest date Ranbaxy could market its atorvastatin product." JA1073-4.

51

Mr. West's final sign off on Ranbaxy's ANDA on November 7, 2011, for OGD showed how the decision to grant the AIP exception and review Ranbaxy's ANDA on an expedited basis were intertwined and driven by the November 30, 2011, entry date. Mr. West wrote that the AIP exception was "granted in order to permit OGD and OC to assess the reliability of the data." JA1180. And, "[t]o permit this determination to be made prior to the effective date of the settlement agreement [November 30, 2011], Expedited Review status was granted to Ranbaxy's ANDA and also to several other ANDAs." *Id.*

Thus, the settlement entry date played a material role in the timing of FDA's grant of the AIP exception. The district court's conclusion that "significant factual history" of Ranbaxy's communications with FDA "cuts against Plaintiffs' argument" (JA0092) resulted from its refusal to consider seriously the hypothetical question at the heart of the causation issue: When would FDA have likely approved generic Lipitor had Pfizer and Ranbaxy agreed to an earlier entry date in the absence of the reverse payment? FDA considered all potential pathways to get generic Lipitor on the market, and the date that Pfizer paid Ranbaxy to accept was a material factor in its deliberations (as well as those of other generics trying to get on the market). Had that date been earlier, it is likely that FDA would have also granted an earlier exception to its AIP if necessary to get generic Lipitor on the market by that earlier date, consistent with FDA's "long-term goal of reviewing

pending ANDAs in such a manner that, by the time . . . barriers to approval have expired, appropriate reviews will have been completed." JA2096 n.1. In such a but-for world, the actual dates of approval emphasized by the district court (*e.g.*, JA0092-93) do not establish that FDA approval could not have occurred earlier.

## IV. THE DISTRICT COURT'S GRANT OF BIFURCATED DISCOVERY WAS REVERSIBLE ERROR.

Bifurcation at trial is disfavored by this Court. *Barr Labs., Inc. v. Abbott Labs.*, 978 F.2d 98, 115 (3d Cir. 1992). Following this directive, district courts in this Circuit have denied motions to bifurcate discovery. *See, e.g.*, *Clarity Sports Int'l LLC v. Redland Sports*, 400 F. Supp. 3d 161, 184-85 (M.D. Pa. 2019); *Hanover 3201 Realty LLC v. Village Supermarkets, Inc.*, No. 2:14-cv-1327 (SRC)(CLW), 2016 WL 4541870, at *2-3 (D.N.J. Aug. 31, 2016). Courts denying bifurcation recognize that bifurcation often delays cases and leads to serial motion practice. *Wilson v. Quest Diagnostics, Inc.*, No. 18-11960 (WJM), 2019 WL 7560932, at *2, *4 (D.N.J. Aug. 22, 2019). The better and more efficient way to proceed is with one round of summary judgment motions after full discovery. *Id.* Bifurcation of discovery should be limited to cases with a "narrow, potentially dispositive issue" that is "totally distinct." *MacLean v. Wipro Ltd.*, No. 20-03414 (GC)(JBD), 2023 WL 3742832, at *3 (D.N.J. May 31, 2023).

This case illustrates the dangers of bifurcation. It is now more than thirteen

53

years since it was filed, *Lipitor*, 868 F.3d at 245, and more than seven years since it was remanded by this Court; yet, the only substantive issue on which discovery is complete and any depositions have been taken is the narrow issue of FDA approval.  If this Court decides in Plaintiffs' favor, Plaintiffs will face the daunting prospect of discovering facts that occurred more than fifteen years ago.  If the Court reverses as requested by Plaintiffs, it should direct the lower court to finally allow full discovery of this case.

More importantly, the district court's bifurcation order was substantively prejudicial because the FDA approval issue was not "totally distinct."  As Plaintiffs explained in objections to the magistrate judge's bifurcation order and in their Rule 56(d) affidavit, the issue of causation in this case is intertwined with its merits. JA2443-8 (Aff. ¶¶ 12, 15, 18, 19, 22-23).  Had Plaintiffs been permitted full discovery, they would have provided an expert economic model that estimated a "no-payment" entry date that would have been in the economic interests of both Pfizer and Ranbaxy.  JA2446-7 (Aff. ¶ 22).  The model requires inputs on issues including the forecasted revenues of Pfizer and Ranbaxy with and without generic entry, the expected time to resolve their patent litigation, and Pfizer and Ranbaxy's expectations of the outcome of the patent litigation.  *Id.*  Plaintiffs were not permitted full discovery on these issues and were not able to explore the basis for public statements made by Pfizer's former top executive that "there are dozens of

generic drug manufacturing companies with a red circle around June 28, 2011," the

expiration date of a principal Lipitor patent, and that "we expect to lose exclusivity

on Lipitor in June of 2011." *Id.* It is reversible error for a district court to grant

summary judgment without providing full discovery on the relevant issues.

*Mannington Mills, Inc. v. Congoleum Indus., Inc.*, 610 F.2d 1059, 1073 (3d Cir.

1979); *Arnold Pontiac-GMC*, 786 F.2d at 568.

The district court's restrictions on discovery likely contributed to its

misunderstanding of the causation issue. It viewed the issue of the timing of

FDA's approval in the abstract without connecting it to the assumed violation. It

blocked Plaintiffs from offering their complete economic causation model, which

would have demonstrated the link between Defendants' violation and the delay of

generic entry and provided a specific date (or date ranges) that would have

permitted Plaintiffs' regulatory expert to explain how FDA could have approved

Ranbaxy's ANDA by the estimated date. It would have been clear from this

evidence that the causation analysis was hypothetical. The limited scope of

discovery permitted and considered by the district court required it to consider the

regulatory issue without any context. The court's order was prejudicial and

constituted reversible error.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's order granting summary judgment and remand with instructions that the district court finally allow full discovery of this case.

Dated:  October 29, 2024

Respectfully submitted,

s/ Scott E. Perwin
Scott E. Perwin (FL Bar #710083)
Lauren C. Ravkind (FL Bar #955868)
Anna T. Neill (FL Bar #0100945)
KENNY NACHWALTER, P.A.
1441 Brickell Ave
Miami, FL 33131
Tel. (305) 373-1000
Fax: (305) 372-1861
  *Counsel for Walgreen Co., The Kroger Co., Safeway Inc., Supervalu Inc. n/k/a United Natural Foods, Inc., HEB Grocery Company L.P. n/k/a H-E-B L.P.*

s/ Barry L. Refsin
Barry L. Refsin (PA Bar #62526)
Eric L. Bloom (PA Bar #89031)
Caitlin V. McHugh (PA Bar #323011)
HANGLEY ARONCHICK SEGAL PUDLIN
  & SCHILLER
One Logan Square, 27th Floor
Philadelphia, PA 19103
Tel: (215) 568-6200
Fax: (215) 568-0300
  *Counsel for CVS Pharmacy, Inc, Rite Aid Corporation, Rite Aid Hdqtrs. Corp., JCG (PJC) USA, LLC, Eckerd Corporation, Maxi Drug, Inc. d/b/a Brooks Pharmacy*

s/ Joseph M. Vanek
Joseph M. Vanek (IL Bar #6197046)
David P. Germaine (IL Bar #6274984)
John P. Bjork (IL Bar #6299111)
SPERLING & SLATER, P.C.
55 W. Monroe Street, Suite 3200
Chicago, Illinois 60603
Tel: (312) 641-3200
Fax: (312) 641-6492
  *Counsel for Meijer, Inc. & Meijer Distribution, Inc.*

s/ Moira Cain-Mannix
Bernard D. Marcus (PA Bar #01293)
Moira Cain-Mannix (PA Bar #81131)
Brian C. Hill (PA Bar #204489)
MARCUS & SHAPIRA LLP
One Oxford Centre, 35th Floor
Pittsburgh, PA 15219
Tel.: (412) 338-3344
Fax: (412) 391-8758
  *Counsel for Giant Eagle, Inc.*

## CERTIFICATE OF BAR MEMBERSHIP

In accordance with Local Rule of Appellate Procedure 28.3(d), I certify that I

am a member of the bar of the United States Court of Appeals for the Third Circuit.


s/ Barry L. Refsin
Barry L. Refsin

**CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(G) AND LOCAL RULE 31.1(C)**

1.  This brief contains 12,880 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word in Times Roman, 14-pt font for text and footnotes.

3. The text of the electronic pdf version of this brief is identical to the text in the paper copies.

4. SentinelOne 23.4.4.223 was used to scan the pdf version of this brief, and no virus was detected.

Dated:  October 29, 2024

s/ Barry L. Refsin_____
Barry L. Refsin

**CERTIFICATE OF SERVICE**

I, Barry L. Refsin, certify that, on this 29th day of October, 2024, I caused a true and correct copy of the foregoing Brief of Individual Retailer Appellants to be filed under seal on the Court's ECF system together with a motion to maintain it under seal provisionally for fourteen days to afford Appellees an opportunity to identify redactions and move the Court to maintain the unredacted brief under seal. I further caused a true and correct copy of the Brief to be served via electronic mail on all counsel for Appellees.  I also certify that seven hard copies of this Brief will be delivered to the Office of the Clerk for the United States Court of Appeals for the Third Circuit.

s/ Barry L. Refsin
Barry L. Refsin